**Opinion issued January 28, 2025.**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-23-00041-CR

_____

**LAWERANCE WHITE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 428th District Court**
**Hays County, Texas**
**Trial Court Case No. CR-21-2402-D**

## MEMORANDUM OPINION

Appellant Lawerance White was charged with two counts of possession of a

controlled substance after methamphetamine and cocaine were found during a traffic

stop in the car he was driving.[1]  A jury found White guilty of the second-degree felony offense of possession of a controlled substance-methamphetamine-four grams or more but less than 200 grams and the state-jail felony offense of possession of a controlled substance-cocaine-less than one gram and the trial court assessed White's punishment at five years' incarceration for possession of methamphetamine and two years in state jail for possession of cocaine and ordered the sentences to run concurrently.

On appeal, White argues: (1) the trial court abused its discretion by denying his motion to suppress the methamphetamine and cocaine found in the car he was driving because (a) the officer who detained him did not have reasonable suspicion to believe that White had committed a traffic violation, (b) the stop was illegally extended beyond the amount needed to investigate and resolve the alleged traffic issues, and (c) White did not voluntarily give consent for the officer to search the car; (2) the trial court erred by refusing to include an Article 38.23 instruction in the charge because there was a question of material fact regarding the legality of the

---

[1]     Pursuant to its docket-equalization authority, the Texas Supreme Court transferred this appeal from the Third Court of Appeals to this Court.  *See* Misc. Docket No. 23-9079 (Tex. Sept. 26, 2023); *see also* TEX. GOV'T CODE § 73.001(a) (authorizing transfer of cases).  We are unaware of any conflict between the precedent of that court and of this Court on any relevant issue.  *See* TEX. R. APP. P. 41.3.

traffic stop; and (3) the evidence was insufficient to establish that White knowingly possessed the methamphetamine and cocaine.[2]

We affirm the trial court's judgment.

## Background

White was driving his girlfriend's car on Highway 290 around 10:30 p.m. when he was stopped by Officer Jose Castillo with the Hays County Sheriff's Office. Officer Castillo arrested White after he found a bag resembling a backpack in the backseat of White's car containing methamphetamine and cocaine.[3] Videos of the incident captured by Officer Castillo's dash camera and body camera were admitted into evidence during a pre-trial suppression hearing and again at trial.

---

[2] The State's brief was due on September 14, 2023. TEX. R. APP. P. 38.6(b). On July 15, 2024, we notified the State that its brief was late and that if it intended to file a brief, it was required to file within ten days of the notice a motion requesting an extension of time along with its brief or a motion to extend time to file a brief. The State did not file a brief nor request additional time in which to do so. When, as here, the State fails to file a brief, we must conduct an independent analysis of the merits of Appellant's claims of error, limited to the arguments raised at trial by the State, to determine if there was error. *See Little v. State*, 246 S.W.3d 391, 398 (Tex. App.—Amarillo 2008, no pet.) (citing *Siverand v. State*, 89 S.W.3d 216, 220 (Tex. App.—Corpus Christi 2002, no pet.). This Court's independent review "should not be construed as approval of the State's dereliction of its responsibility to file a brief." *Little*, 246 S.W.3d at 397–98; *id.* ("The State's failure to file a brief, in this or any other action, makes the job of this Court considerably more time consuming and difficult.").

[3] The purse, which resembles a small backpack, is also referred to as a bag. We refer to it as the bag for purposes of this appeal.

## A.    Dash Camera Video

Officer Castillo's dash camera video shows two cars and an 18-wheeler truck traveling on a three-lane road approaching an intersection on Highway 290 late at night. White, who was driving a car in the far-right lane, was being followed by an 18-wheeler truck and a third car was traveling in the far-left turn lane behind White's car. White activated his vehicle's brakes, and so did the 18-wheeler driver behind him.[4] The video reflects that White had also activated the car's left turn signal and White's car was moving into the left lane as the 18-wheeler veered right and onto the right shoulder. White immediately crossed into the far-left turn lane after the car in the turn lane passed in front of him. White turned left at the light and pulled into a gas station parking lot.

## B.    Body Camera Video

The video captured by Officer Castillo's body camera reflects that White was the driver and only occupant of the car. After he approached White's car, Officer Castillo told White that he stopped him because White "went right across from the right shoulder all the way across to the turning lane. I mean you could have gotten into a crash right there." After Officer Castillo asked White for his driver's license and proof of insurance, White told Officer Castillo that the car was not his and he

---

[4]    The car in the turn lane may not have activated its brakes, but it is not clear from the video.

4

did not have his driver's license with him, but he had a picture of his license on his phone.

White told Officer Castillo he was driving to Fredericksburg, and he had been trying to move over to the left turn lane because he needed to refill the car's gas tank. When asked where he was from, White told Officer Castillo that he was from Georgia and moved to Texas after he was discharged from the Army. White stated that he lived in Round Rock, and he was not familiar with the area where he was stopped.

When asked why he was going to Fredericksburg, White responded that he had a friend there who needed help and he needed to pick her up. White apparently did not recall the friend's name and after looking at his phone briefly, he told Officer Castillo that her name was Lindsay Love and he accidently referred to Officer Castillo as "ma'am." White told Officer Castillo that the car belonged to his girlfriend, Angelina Hernandez. After looking in the glove compartment, White told Officer Castillo that he did not know where to locate the insurance information.

Officer Castillo briefly walked to his patrol vehicle and then told White to step out of the car. He explained to White that he needed him to get out of the car because White did not have his driver's license and he needed to make sure that "everything checks out there before I let you go." White told Officer Castillo that he did not have any weapons and consented to Officer Castillo's request to pat him

5

down. Officer Castillo told White that his out-of-state license was "not eligible" and he did not have a Texas driver's license. White told Officer Castillo that he had not been able to locate the insurance information. When asked if he had been on the phone with his girlfriend, White informed Officer Castillo that he had been talking to his girlfriend's brother. When Castillo asked White for his girlfriend's brother's name, White hesitated briefly, then apologized to Officer Castillo and told him he had PTSD, before telling Officer Castillo that the brother's name was Chris. White, who was smoking a cigarette and fidgeting with a bandana, told Officer Castillo that he tried calling his girlfriend Angelina, but she did not answer. When White asked if he could try calling her again, Officer Castillo told White not to call her yet because he had some questions for White.

Officer Castillo asked White how long he and Angelina had been together, and White told him that he and Angelina had been dating over a year and he offered to call Angelina so that she could confirm that she had loaned White her car. Officer Castillo told White that he had a few more questions for him and told him to "take a deep breath," "I sense you are nervous, man, I'm not here to hurt you or anything like that, I just want to make sure everything checks out." When White asked if he could retrieve his lighter to light his cigarette, Officer Castillo told White that he would prefer it if White did not smoke while they were talking.

White told Officer Castillo that he left Round Rock thirty minutes ago. He stopped and bought two energy drinks and he was on his way to pick up Love and take her to Elgin. When asked how long he had known Love, White told Officer Castillo that "she was the person who just messaged" him randomly and she asked him for help and offered to pay him $60 for gas money if he would drive her to Elgin.

Officer Castillo replied, "Some random person. Lindsay?" White offered to show the officer the message. Officer Castillo, who was reading the message out loud, stated, "I missed you. Happy to see you finally." White told Officer Castillo that Love thought she was texting someone else. Officer Castillo asked White, "You're just going to go pick her up? That's kind of weird, man. I've never heard of someone doing that." White told the officer that a stranger had helped him once when his car's battery died, and he was trying to show someone else the same kindness.

Officer Castillo informed White that he was not going to issue him a citation, but he wanted to "make sure there isn't anything illegal in the car and stuff like that." Officer Castillo told White that he "see[s] you are nervous and stuff like that and I've taken into account you said you have PTSD and stuff like that." Officer Castillo further stated, "Like I said, I'm not here to harm you or anything, but my main thing is making sure there is nothing illegal in the car. Is there anything illegal in the car?"

White replied that he did not know because it is his girlfriend's car and he just picked up the car from Angelina thirty minutes ago. White told Officer Castillo that he did not want to get in trouble for something he did not know was there. When asked if he or Angelina smokes, White told him that Angelina smokes marijuana, but he does not, and she has her own "choice of drugs." Officer Castillo informed White that he was "not in any trouble or anything like that. I can see you are calming down now. Everything is cool. So you say you have no idea if there is anything illegal in the car. Do you mind if I check just to make sure? Because my job is to make sure there is nothing illegal in the car." White offered to check the car himself and he told Officer Castillo that if he found anything he would throw it away. Officer Castillo asked again if he could search the car, and White told him that he did not want to get in trouble if there was contraband in the car because he did not know if there was anything illegal in the car and he did not want to "take the risk."

Officer Castillo told White that if it was "just marijuana or something like that, I'm not, I'm not. . ." White interrupted and told Officer Castillo that Angelina had "her own choice of drugs." Officer Castillo asked, "Is there possibly. . .what is her choice of drugs that are in there?" White responded that she likes to use "ice, pills, amphetamines" and he did not want to "take the rap for that." When Officer Castillo asked again if he could confirm that there was nothing illegal in the car,

White reiterated that he does not want to be held responsible for it and "if it is in there, I don't want to get in trouble for it."

Officer Castillo told White that they reached the point where he needed to search the car. When White asked Officer Castillo if he was going to get in trouble if the officer found drugs in the car, Officer Castillo told him that he would need to find out who the drugs belong to, and if White could tell him where he got the drugs from or if the drugs belonged to Angelina, they could "talk about that." Officer Castillo asked again if he can search the car, and White told him that he would prefer it if the officer did not because he did not "want to get in trouble for that." White told Officer Castillo that he was just "asking you, I'm you begging to just [can't understand.]"

White told Officer Castillo that he understood where the officer was coming from and, "If it was my car, and I had been in it and had control of it all day, I would have no problem with it." When Officer Castillo told White that the issue was that White had been driving the car, White offered to call his girlfriend Angelina who could confirm that he had just taken possession of the car. According to White, Angelina had been out with the car, and when she came home, he got in the car and left. "So what am I looking at? What's your next step?"

When Officer Castillo told White that he was going to call for additional resources, White showed his shaking hands to the officer and asked if he could get

9

his cigarette lighter. The officer told White to take a deep breath and White admitted to Officer Castillo that he was "extremely nervous." Officer Castillo warned White not to "stress out" because "those are red flags for me." White told Officer Castillo that he was on probation for assault with a deadly weapon and he admitted that "back in the day [he] used to use."[5]

White told Officer Castillo that "if there is something in there, it's not mine" and he does not "want to take the wrap for that." When Officer Castillo reiterated that he needed to search the car, White asked if he could take his belongings from the car before the officers searched it for contraband, and White asked for reassurance that he will not get in trouble for anything in the car that does not belong to him.

Officer Castillo tells White, "So I'm just asking if I can search the car." White responds, "I'm just asking, can I just pull out my stuff so you know what's mine." White tells Officer Castillo that the only things in the car that belong to him are the energy drinks, the cigarettes, and two soft drinks in the front seat. Officer Castillo said, "Okay. Well, that was it? Ok. And then I can search it?" White answered, "Yes."

---

[5]    This portion of the body camera video was redacted when the video was shown to the jury.

10

White continued to ask for reassurance that he would not be held responsible for anything in the car that did not belong to him. Officer Castillo told him they would "get to that when we get to that," but "if there is a gram of marijuana in there, man, I'm not tripping." White responded, "I know her bag is in there. That is hers. I have nothing to do with that." Officer Castillo, who told White that he was going to get White's cigarettes and lighter from the car, opened the front and back passenger side doors and he retrieved a bag from the floor behind the passenger seat. Officer Castillo looked inside the bag and then grabbed White's cigarette package from the front seat and gave it to White. He detained White, read him his *Miranda* rights, and placed him in the backseat of his patrol vehicle. White told Officer Castillo that he did not know there was methamphetamine in Angelina's bag, but he thought it was a possibility because "she left."

White was arrested and charged by indictment with the second-degree felony offense of possession of a controlled substance-methamphetamine-four grams or more but less than 200 grams and the state jail felony offense of possession of a controlled substance-cocaine-less than one gram.

## C. Motion to Suppress

Prior to trial, White filed a motion to suppress the methamphetamine and cocaine found in his car arguing (1) Officer Castillo did not have reasonable suspicion to make the initial traffic stop, (2) Officer Castillo illegally prolonged the

11

stop beyond the point where it was necessary to resolve the alleged traffic violation, and (3) White did not consent voluntarily to the search of the car. During the pre-trial hearing on White's motion, the trial court admitted into evidence Officer Castillo's dash camera and body camera videos. No witnesses testified at the hearing.

White argued that the dash camera video showed that he had not violated any traffic laws, and thus Officer Castillo did not have reasonable suspicion to believe that White had committed an offense which would justify the initial stop. White's counsel stated, "I'm assuming, from what the officer stated, that he is referencing Transportation Code 545.062, that you can make a lane change as long as it's done safely, that's an assumption on my part."[6] White argued that he changed lanes safely because he used his left turn signal as he braked to allow the car on the left lane to pass him before moving into the left turn lane. According to White, the truck behind him had to brake because the truck was following too closely, and not because of anything White did wrong.

The State responded that the dash camera video showed that White committed multiple traffic violations. According to the State, White violated the law when he

---

[6]     Although White's counsel mistakenly identified the statute as Transportation Code Section 545.062, counsel was clearly referring to Section 545.060. *Compare* TEX. TRANSP. CODE § 545.060(a) (addressing lane changes) *with* TEX. TRANSP. CODE § 545.062 (requiring operators to follow behind other vehicles at specific distances).

12

"stop[ped] in the middle of the road" causing "the truck [to] move off," failed to drive "as much as practicable in the lane" when he made "all the lane changes at once," and White "crosse[d] a solid white line, that left, turn-only lane where the clear intention from the solid white line, it's not meant to be crossed." The State argued that regardless of whether Officer Castillo was correct in believing that White committed a traffic violation, the video demonstrated that the officer was "certainly justified and supported by reasonable suspicion that a violation of traffic law had occurred, in fact, multiple violations of traffic law."

White also argued that the methamphetamine and cocaine should be suppressed because Officer Castillo illegally prolonged the stop beyond the point where it was necessary to resolve the alleged traffic violation. According to White, Officer Castillo's investigation into the traffic violation ended when Officer Castillo told White that he was not going to issue him a citation and, at that point, there were no facts from which Officer Castillo could reasonably suspect that White was engaged in criminal activity.

The State argued that there were numerous suspicious circumstances from the beginning of the stop, including that White was driving someone else's car, he could not find proof of insurance, and White only had a photograph of his driver's license, which was later found to be invalid. The State argued that as Officer Castillo investigated these possible violations, White "ke[pt] giving him more and more

13

evidence that something fishy is going on here." The State argued that before the search began, White was nervous, White's claim that he had just met Love was inconsistent with the text message from Love in which she told White that she could not wait to see him again, and White told Officer Castillo "about using drugs." According to the State:

> And when we get to the point where we've got all these facts, facts that as [White's counsel] acknowledged, going to a -- coming from a strange place; meeting someone you just met that day, according to you, and even there it's not clear; driving around with no insurance; car you don't own; no valid driver's license. The more we find out, the more the officer is justified in suspecting there's something else going on here. Once the drug conversation starts going and defendant starts admitting, maybe there's something in there, I don't know, the officer is definitely justified in the search.

White responded that most of the evidence the State was referring to "occurred after the time that it was clear that the original investigation was pretty much ended when he stated, I'm not issuing a citation, but I do have other questions for you."

White also argued that the methamphetamine and cocaine should be suppressed because he did not voluntarily consent to the search of the car. According to White, his consent to search was not voluntary because he repeatedly denied Officer Castillo's request for permission to search the car and he only consented to the search because Officer Castillo led him to believe that he would not get into trouble for anything found in the car that did not belong to him. The State argued that the search satisfied the Fourth Amendment under both the consent and

14

automobile exceptions to the Fourth Amendment's warrant requirement. According to the State,

> But even if the search is not voluntary, I would suggest to the Court the search and the evidence is not suppressible because it's also a probable cause search. At that point, we have all the facts we've talked about, I won't belabor the Court by going over again. The officer knows about the criminal record at that point, knows about the possible presence of drugs at that point from the defendant's own mouth . . . We've got a good stop, a good length of detention, a good search under both doctrines consent or probable cause backed up by the evidence.

## D. Trial Testimony

Officer Jose Castillo with the Hays County Sheriff's Office testified that at approximately 10:30 p.m., he stopped the car White was driving along Highway 290. When asked what prompted him to stop White's car, Officer Castillo testified:

> I saw a vehicle that was driving in and out of traffic. Some vehicles had to brake. They'd brake suddenly, so then it caught my attention to the specific vehicle and so I caught up to it, read the license plate, and made the stop.

Officer Castillo testified that when he approached White's car, he told White why he stopped him, and he asked White for his license and proof of insurance. White did not have his driver's license with him, but he offered Officer Castillo a photograph of his driver's license on his phone. Officer Castillo testified that he was able to read White's birthdate and other information from the photograph and run the information. Officer Castillo testified that White's failure to have his driver's license with him was the only "unusual" thing about the documentation. He thought

15

it was odd that White did not have his girlfriend's brother's phone number saved in his phone.

Officer Castillo testified that nervousness and inconsistent answers to questions are suspicious behaviors. Officer Castillo testified that although White was consistent about some things, such as that he was going to Fredericksburg, White made inconsistent statements about his relationship with Love. According to Officer Castillo, White told him that he had just met Love that day, but the text message Love sent to White disputed White's claim because, in her message to White, Love stated that she could not wait to see him again.

Officer Castillo testified that although White admitted to being nervous after he got out of the car, Officer Castillo had noticed signs of nervousness before that point. According to Officer Castillo, White was speaking quickly, and his rate of speech was a sign that White was nervous or anxious. Officer Castillo testified that White's justifications regarding where he was going, why he did not have his driver's license with him, and why he did not have proof of insurance, indicated to Officer Castillo that White was nervous.

When he was talking with White, Officer Castillo noticed "an excess of air fresheners and energy drinks" in the car. According to Officer Castillo, the presence of excessive energy drinks indicates a person is trying to stay awake and air fresheners indicate someone is trying to hide an odor, including the odor of illegal

drugs such as marijuana. Although these factors standing alone are not meaningful, when "paired with something else there would be the indication that something may be transported for a very long distance that somebody is trying to mask an odor of."

Officer Castillo testified that White told him that his girlfriend Angelina's drug of choice was ice, which is another name for methamphetamine. According to Officer Castillo, a person's reference to methamphetamine as ice indicates that the person is familiar with the drug by virtue of either having used the drug in the past or otherwise being exposed to the drug. Officer Castillo testified that White did not "deny it was possible" that drugs were in Angelina's car, and when he asked White if he knew there were drugs in Angelina's bag, White told him it was possible, but he did not know for sure. Officer Castillo considered White's statements as an admission that White suspected that Angelina's car had drugs in it.

When asked what he recovered during the search of White's car, Officer Castillo testified that he went immediately to the bag because White had "emphasize[d] that that wasn't his," which indicated to Officer Castillo "that had to be where the contraband, the illegal thing I was searching for." Officer Castillo identified the items he found in the bag, which were later established to be cocaine and methamphetamine.

Oscar Cazares, a forensic scientist with the Texas Department of Public Safety, was the only other witness to testify during the guilt-innocence phase of trial.

17

Cazares testified—and White does not dispute on appeal—that Officer Castillo recovered 10.28 grams of methamphetamine and 0.13 grams of cocaine from the bag found in the back seat of White's car.

**E.    Charge Conference - Article 38.23**

During the charge conference, White requested an instruction under Article 38.23(a) of the Code of Criminal Procedure regarding the legality of the traffic stop. Article 38.23 prohibits the admission of evidence obtained illegally by an officer and, when evidence presented before the jury raises a question of whether the fruits of a police-initiated search were illegally obtained, "the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained." TEX. CODE CRIM. PROC. art. 38.23(a).

White argued there was a "fact issue as to whether or not what [Officer Castillo] described happening at the time of the stop was what was actually happening on the video." The following exchange then ensued:

Court:    Okay. What is the specific fact in dispute?

White:    Your Honor, it's his driving.  He testified he was all over the road, in and out of lanes; and several other cars were around that were—I forget his exact words, but that there were several other cars around that had to move or—I have to look up exactly—but it's the description of his driving behavior, basically, as being reckless and all over the road.  I know he said, "all over the road" or "in and out."  And as you've seen on that video, that's simply not the case.

18

. . .

Court: And it's your specific contention that the factual dispute has to do with the reason for the stop.

White: No, sir. Well, no, sir, not exactly.

Court: Okay.

White: My factual dispute argument has to do with his testimony of what the driving facts were, not any—

Court: That led to the reason for the stop?

White: That's correct. But I don't know that he even testified what the reason was, he just said—he just described the driving, he never said that it was a violation of any law, as I recall. So the dispute is in the description.

The State argued that even if there was "affirmative evidence that [White] didn't quite drive the way [Officer Castillo] described, [Officer Castillo] still had ample basis for his reasonable suspicion that a traffic violation had occurred." The trial court denied White's request to include an Article 38.23 instruction in the charge.

The jury found White guilty of the second-degree felony offense of possession of a controlled substance-methamphetamine-four grams or more but less than 200 grams and the state-jail felony offense of possession of a controlled substance-cocaine-less than one gram. The trial court sentenced White to five years' incarceration for possession of methamphetamine and two years in state jail for possession of cocaine and ordered the sentences to run concurrently. This appeal followed.

19

## Sufficiency of the Evidence

In his third issue, White argues there is insufficient evidence to establish that he knowingly possessed the methamphetamine and cocaine found in the car he was driving. According to White, the evidence is insufficient to establish that he knowingly possessed the methamphetamine and cocaine because there is no evidence linking him to the methamphetamine and cocaine other than the fact that he was the sole occupant of the car. Because resolution of this issue in White's favor would afford greater relief than his remaining issues, we address this issue first. *See Campbell v. State*, 125 S.W.3d 1, 4 n.1 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (stating reviewing courts should first address issues that, if sustained, require reversal and rendition of judgment before addressing issues seeking remand).

### A. Applicable Law

We apply the legal sufficiency standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979) in determining whether the evidence is sufficient to support each element of a criminal offense that the state must prove beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). We review the legal sufficiency of the evidence by determining "whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Sanders v. State*, 119 S.W.3d 818, 820 (Tex. Crim. App. 2003). Under a legal sufficiency

20

review, "our role is not to become a thirteenth juror. This Court may not re-evaluate the weight and credibility of the record evidence and thereby substitute our judgment for that of the fact-finder." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (quoting *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999)). Our role in this review is to act as a "due process safeguard," requiring us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the offense of which he is accused. *Malbrough v. State*, 612 S.W.3d 537, 559 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd) (citing *Williams*, 235 S.W.3d at 750). We may consider both direct and circumstantial evidence in our legal sufficiency analysis, as well as any reasonable inferences that may be drawn from the evidence. *Id.*

We examine all evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *Williams*, 235 S.W.3d at 750. "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "the standard of review on appeal is the same for both direct and circumstantial evidence cases." *Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010) (quoting *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (stating "circumstantial evidence alone can be sufficient to establish guilt").

21

The trier of fact is the sole judge of the weight and credibility of the evidence. *See Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018). Thus, we defer to the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 318–19. A reviewing court, faced with a record of historical facts supporting conflicting inferences, must presume the factfinder resolved any such conflict in favor of the prosecution, and must defer to that resolution. *Id.* at 326.

## B.    Possession of a Controlled Substance

White was charged with (1) intentionally or knowingly possessing a controlled substance, namely methamphetamine, in an amount of more than 4 grams but less than 200 grams, and (2) intentionally or knowingly possessing a controlled substance, namely cocaine, in an amount less than one gram. TEX. HEALTH & SAFETY CODE § 481.115(a).[7] To convict White of possession of possession of methamphetamine and cocaine, the State had to prove White knowingly or

---

[7] Methamphetamines and cocaine are included in penalty group 1. TEX. HEALTH & SAFETY CODE § 481.102(3)(D) (cocaine), (6) (methamphetamine). The charge against White for possession of cocaine is a state-jail felony and the charge for possession of methamphetamine is a second-degree felony. *See id.* § 481.115(a)–(b) (stating knowing or intentional possession of controlled substance from penalty group 1 is state-jail felony if amount of controlled substance possessed, by aggregate weight, including adulterants or dilutants, less than one gram); § *id.* 481.115(a), (d) (stating knowing or intentional possession of controlled substance from penalty group 1 is second-degree felony if amount possessed is greater than four grams and less than 200 grams).

intentionally exercised control, management, or care over the methamphetamine and cocaine. *See Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016) (citing Tex. Health & Safety Code § 481.115(a)); *see also* Tex. Penal Code § 1.07(a)(39) (defining possession as actual care, custody, control, or management).

**C.  Requisite Mental State for Possession of a Controlled Substance**

The only element White disputes is whether there is sufficient evidence that he intentionally or knowingly possessed the methamphetamine and cocaine found in the car inside the bag. *See* Tex. Health & Safety Code § 481.115(a) (identifying culpable mental state for possession of controlled substance as knowing or intentional). The Texas Penal Code defines the required culpable mental states of intentional and knowing. *See* Tex. Penal Code § 6.03(a)–(b). Section 6.03(a) states that a "person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). Section 6.03(b) states a "person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b). In other words, a defendant "intentionally possesses contraband when it is [his] conscious objective or desire to

23

do so and knowingly possesses when [he] is aware that [he] has contraband." *Heckel v. State*, No. 11-08-00137-CR, 2010 WL 1615900, at *2 (Tex. App.—Eastland Apr. 22, 2010, no pet.) (mem. op., not designated for publication) (citing TEX. PENAL CODE § 6.03(a), (b)); *cf.* TEX. PENAL CODE § 6.02(d) ("Culpable mental states are classified according to relative degrees, from highest to lowest, as follows (1) intentional; (2) knowing; (3) reckless; (4) criminal negligence.").

**D.     Intentional or Knowing Possession**

The fact that a person is the sole occupant of a vehicle is sufficient evidence to establish that the person has possession of the vehicle and supports an inference that the person had knowledge of and control over any contraband within the vehicle. *See Baxter v. State*, No. 14-19-00980-CR, 2021 WL 2656545, at *4 (Tex. App.—Houston [14th Dist.] June 29, 2021, pet. ref'd) (mem. op., not designated for publication); *see also Harmond v. State*, 960 S.W.2d 404, 406 (Tex. App.—Houston [1st Dist.] 1998, no pet.) ("Because appellant was exercising dominion and control over the car, an inference arises that he knew it contained contraband."); *Alvarado v. State*, No. 11-10-00262-CR, 2012 WL 3133792, at *2 (Tex. App.—Eastland July 26, 2012, no pet.) (mem. op., not designated for publication) ("When a defendant has exclusive possession of the place where a controlled substance is found, her knowledge of and control over the substance may be inferred."); *McCarthy v. State*, No. 14-00-00975-CR, 2001 WL 1340542, at *4 (Tex. App.—Houston [14th Dist.]

24

Nov. 1, 2001, no pet.) (mem. op., not designated for publication) (stating "an inference may be drawn from a person's control over a vehicle to show knowledge of the contraband concealed therein").

When the contraband is not in the exclusive possession of the defendant, a fact finder may nonetheless infer that the defendant intentionally or knowingly possessed the contraband if there are sufficient independent facts and circumstances justifying such an inference. *Tate*, 500 S.W.3d at 413–14 (citing *Poindexter v. State*, 153 S.W.3d 402, 406 (Tex. Crim. App. 2005)); *see also Evans v. State*, 202 S.W.3d 158, 161 (Tex. Crim. App. 2006) ("Regardless of whether the evidence is direct or circumstantial, it must establish that the defendant's connection with the drug was more than fortuitous.").

The Court of Criminal Appeals has adopted a "non-exclusive list of fourteen factors" that "may indicate a link connecting the defendant to the knowing possession of contraband." *Tate*, 500 S.W.3d at 414. Those factors, referred to as the affirmative links rule, are:

> (1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the narcotic; (4) whether the defendant was under the influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs

25

were found; (12) whether the place where the drugs were found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt.

*Id.* (quoting *Evans*, 202 S.W.3d at 162 n.12). "It is . . . not the number of links that is dispositive, but rather the logical force of all of the evidence, direct and circumstantial." *Evans*, 202 S.W.3d at 162; *see also Robinson v. State*, 174 S.W.3d 320, 326 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) ("[T]he number of factors actually supported by the evidence is not as important as the 'logical force' they collectively create to prove that a crime has been committed.").[8]  Similarly, the "absence of various affirmative links does not constitute evidence of innocence to be weighed against the affirmative links present." *James v. State*, 264 S.W.3d 215, 219 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd).  While the factors are intended to help guide the court's analysis, the ultimate inquiry is whether, "[b]ased on the combined and cumulative force of the evidence and any reasonable inferences therefrom," the jury was "rationally justified in finding guilt beyond a reasonable doubt?" *Tate*, S.W.3d at 415 (citing *Jackson*, 443 U.S. at 318–19).

---

[8]  The affirmative links are "simply some factors which may circumstantially establish the legal sufficiency of the evidence to prove a knowing 'possession.'  They are not a litmus test." *Evans v. State*, 202 S.W.3d 158, 162 n.12 (Tex. Crim. App. 2006).

**E.     Analysis**

White argues the evidence is insufficient to establish that he knowingly possessed the methamphetamine and cocaine because there is no evidence linking him to the methamphetamine and cocaine other than the fact that he was the driver and sole occupant of the car. According to White,

> While Appellant was in sole possession of the automobile at the time of the stop, there is still a question regarding whether he knew there was contraband in the vehicle. The methamphetamine and cocaine were found in a purse that was in the back seat and out of reach of defendant when he was stopped by Officer Castillo. Officer Castillo provided no testimony that Appellant was seen reaching into the back seat to move items. The videos show no motion by Appellant that could be interpreted as him moving items into the back seat. There was nothing to show the contraband was visible to someone in the driver's seat or to anyone without reaching into the purse to remove items.
>
> The State argued to the jury that Appellant's statements that 1) the purse did not belong to him and 2) his girlfriend was a drug user so it was possible the purse contained illegal drugs constituted sufficient evidence that he knew of the existence of contraband. However, it should be noted that there was nothing to indicate Appellant knew the purse was in the car at the time he took possession of the vehicle, so it is equally likely that Appellant only became aware after he was stopped of the presence of the purse and the possibility there was contraband in the car.

White acknowledges that he was in "sole possession of the automobile" when Officer Castillo recovered a bag in the car's backseat containing methamphetamine and cocaine. White's undisputed exclusive possession of the car supports an inference that he knew of and exercised control over the methamphetamine and cocaine found in the car. *See Harmond*, 960 S.W.2d at 406 ("Because appellant was

27

exercising dominion and control over the car, an inference arises that he knew it contained contraband."); *Menchaca v. State*, 901 S.W.2d 640, 652 (Tex. App.—El Paso 1995, pet. ref'd) (stating "[k]nowledge of the presence of contraband may be inferred from control over the vehicle in which the contraband is concealed"); *see Baxter*, 2021 WL 2656545, at *4 (same); *Alvarado*, 2012 WL 3133792, at *2 (same); *McCarthy*, 2001 WL 1340542, at *4 (same).

White argues that the evidence is insufficient to link him to the methamphetamine and cocaine because the drugs were "found in a purse that was in the back seat and out of reach of defendant when he was stopped by Officer Castillo," there is no evidence White made any furtive gestures, and there is no evidence that the drugs were "visible to someone in the driver's seat or to anyone without reaching into the purse to remove items." These are some factors courts consider when applying the affirmative links rule. *See Tate*, 500 S.W.3d at 414 (identifying fourteen factors). The affirmative links rule does not apply when, such as here, the contraband is discovered in a place exclusively controlled by the defendant. *See Deere v. State*, 631 S.W.3d 762, 768–69 (Tex. App.—Eastland 2021, pet. ref'd) (stating affirmative links rule does not apply when defendant in exclusive control of area where drugs are found); *see also Rincker v. State*, No. 08-22-00003-CR, 2022 WL 17551793, at *3 (Tex. App.—El Paso Dec. 9, 2022, no pet.) (mem. op., not designated for publication) (holding although appellant did not own car and

28

others had frequently driven car, affirmative links rule inapplicable because appellant "was in exclusive possession of the methamphetamine when it was seized").

Even assuming the State had to prove more than White's exclusive possession of the car in which the drugs were found to establish that White had intentional or knowing possession of the methamphetamine and cocaine, there is nevertheless ample evidence affirmatively linking White to the methamphetamine and cocaine. White, the car's sole occupant, had permission from his girlfriend to drive the car and he was present when the search was conducted. *See Tate*, 500 S.W.3d at 414 (identifying defendant's presence at search and defendant's right to possess place where drugs were found as affirmative links). Officer Castillo's body camera video also reflects that the bag in which the methamphetamine and cocaine were found was on the floor behind the front passenger seat, and thus was found in proximity to and accessible by White, who was sitting in the front driver's seat. *See id.* (identifying defendant's proximity to contraband and whether drugs were found in enclosed space as affirmative links).

Officer Castillo testified that White's rate of speaking indicated to him that White was nervous, and the body camera video reflects that White was fidgeting with a bandana as he spoke to Officer Castillo. Prior to the search, White told Officer Castillo that he did not know if there was anything illegal in the car, but he did not

29

want Officer Castillo to search the car for drugs because he did not want to "take the risk" that Officer Castillo would find contraband in the car. After White told Officer Castillo that Angelina, the car's owner, uses drugs, Officer Castillo asked White "what is her choice of drugs that are in there" and White told him that she used "ice, pills, amphetamines" and he did not want to "take the rap for that." Indeed, White, who claimed to be "extremely nervous," repeatedly sought reassurances that he would not be held responsible for anything in the car that did not belong to him and when White consented to the search, he told Officer Castillo, that Angelina's bag was in the car, and he had "nothing to do with that." The record thus reflects that White was nervous when he spoke to Officer Castillo, and he made incriminating statements supporting that he knew drugs were in the vehicle to Officer Castillo before and after the search—including about the specific bag in which the drugs were found. *See id.* (identifying incriminating statements and indicia of consciousness of guilt as affirmative links).

White argues there is insufficient evidence that he knowingly possessed the methamphetamine and cocaine because the drugs were found in a bag that was in the back seat, which was out of his reach and not visible to him from the driver's seat, there was no evidence that he reached for the bag or made any other furtive movements, and the drugs, which were found inside the bag, were not in plain sight. The alleged absence of some affirmative links, however, does not mean that there is

30

insufficient evidence linking the defendant to the contraband. *See Evans*, 202 S.W.3d at 162 ("It is . . . not the number of links that is dispositive, but rather the logical force of all of the evidence, direct and circumstantial."); *see also James*, 264 S.W.3d at 219 (stating "absence of various affirmative links does not constitute evidence of innocence to be weighed against the affirmative links present"). As previously discussed, White is affirmatively linked to the methamphetamine and cocaine found in the bag by his exclusive possession of the car which he had a right to possess, his presence at the search, his physical proximity to the drugs which were found in an enclosed space, his nervous behavior, and the incriminating statements he made to Officer Castillo. *See Tate*, 500 S.W.3d at 414 (identifying as affirmative links defendant's presence at search, right to possess place where drugs were found, proximity to contraband, whether drugs were found in enclosed space, incriminating statements and indicia of consciousness of guilt as affirmative links).

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have determined beyond a reasonable doubt that White intentionally or knowingly possessed the methamphetamine and cocaine found in the car he was driving. *See Jackson* at 318–19. We thus hold there is legally sufficient evidence supporting White's convictions for possession of methamphetamine and cocaine.

We overrule White's third issue.

31

**Motion to Suppress**

In his first issue, White argues the trial court abused its discretion by denying his motion to suppress the methamphetamine and cocaine found in the car he was driving because (1) Officer Castillo did not have reasonable suspicion to make the initial traffic stop, (2) Officer Castillo illegally prolonged the stop beyond the point where it was necessary to resolve the alleged traffic violation, and (3) White did not consent voluntarily to the search of the car.

## A.    Standard of Review

The United States and Texas Constitutions protect against unreasonable searches and seizures.  U.S. CONST. amend. IV; TEX. CONST. art. I, § 9.  No evidence obtained in violation of the United States or Texas Constitutions can be admitted as evidence against the accused at trial.  TEX. CODE CRIM. PROC. art. 38.23.

Generally, we review a trial court's ruling on a motion to suppress evidence under a bifurcated standard.  *Sims v. State*, 569 S.W.3d 634, 640 (Tex. Crim. App. 2019). We review *de novo* the trial court's determination of legal questions and its application of the law to facts that do not turn upon a witness's credibility.  *Id.*  We afford "almost total deference" to the trial court's "findings of historical fact and determinations of mixed questions of law and fact that turn on credibility and demeanor . . . if they are reasonably supported by the record."  *Id.*; *see also Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010) (stating trial court may believe

32

or disbelieve any witnesses' testimony). When a trial court denies a motion to suppress, we will uphold that ruling under any theory of the law applicable to the case. *Sims*, 569 S.W.3d at 640.

We must view the evidence in the light most favorable to the trial court's ruling. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). When the trial court does not make explicit findings of fact, we imply the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those implied findings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *see Wiede*, 214 S.W.3d at 25.

"That same deferential standard of review 'applies to a trial court's determination of historical facts [even] when that determination is based on a videotape recording admitted into evidence at a suppression hearing.'" *State v. Duran*, 396 S.W.3d 563, 570 (Tex. Crim. App. 2013) (quoting *Montanez v. State*, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006)); *see State v. Houghton*, 384 S.W.3d 441, 446 (Tex. App.—Fort Worth 2012, no pet.) (stating reviewing court should give almost total deference to trial court's factual determinations unless video recording indisputably contradicts those findings). "But when evidence is conclusive, such as . . . 'indisputable visual evidence,' then any trial-court findings inconsistent with that conclusive evidence may be disregarded as unsupported by the record, even when that record is viewed in a light most favorable to the trial court's ruling." *Miller v.*

*State*, 393 S.W.3d 255, 263 (Tex. Crim. App. 2012) (quoting *Tucker v. State*, 369 S.W.3d 179, 187 (Tex. Crim. App. 2012) (Alcala, J., concurring)).

**B.      Reasonable Suspicion for Initial Stop**

White argues the trial court abused its discretion by denying his motion to suppress the methamphetamine and cocaine found in his car because the dash camera video does not show that he committed a traffic violation, and thus Officer Castillo did not have reasonable suspicion that White violated any statute before he initiated the traffic stop that led to the discovery of the methamphetamine and cocaine.

**1.      Applicable Law**

A warrantless automobile stop is a Fourth Amendment seizure analogous to a temporary detention that must be justified by reasonable suspicion. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *see Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011). A police officer is justified in stopping a vehicle if the officer has reasonable suspicion to believe that a traffic violation has occurred. *Lerma v. State*, 543 S.W.3d 184, 190 (Tex. Crim. App. 2018). An actual violation does not need to have occurred; rather, it is only necessary that the officer had a reasonable suspicion that a violation occurred. *Jaganathan v. State*, 479 S.W.3d 244, 247 (Tex. Crim. App. 2015).

Reasonable suspicion exists when the officer can "point to specific and articulable facts which, taken together with rational inferences from those facts,

34

reasonably warrant [the] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *see also*

*Brodnex v. State*, 485 S.W.3d 432, 437 (Tex. Crim. App. 2016) (stating courts

examine facts available to officer at time of investigation). Reasonable suspicion

depends on the "factual and practical considerations of everyday life on which

reasonable and prudent men, not legal technicians, act." *Navarette v. California*,

572 U.S. 393, 402 (2014) (internal quotation and citation removed). It is a less

demanding standard than probable cause and requires a showing "considerably less

than preponderance of the evidence." *Furr v. State*, 499 S.W.3d 872, 878 (Tex.

Crim. App. 2016) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).

Appellate courts "review *de novo* whether the totality of circumstances is

sufficient to support an officer's reasonable suspicion of criminal activity." *Crain*

*v. State*, 315 S.W.3d 43, 48–49 (Tex. Crim. App. 2010); *see also Kothe v. State*, 152

S.W.3d 54, 62–63 (Tex. Crim. App. 2004) (stating "reasonableness" of specific

search or seizure subject to *de novo* review). In doing so, we disregard the subjective

intent of the officer who made the stop and look solely to whether an objective basis

for the stop exists. *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). A

reasonable suspicion determination is made by considering the totality of the

circumstances. *Id.* at 492–93. If a police officer is mistaken about the facts that

caused him to believe that a defendant violated a statute, the officer's mistake of fact

"will not vitiate [the] officer's actions in hindsight so long as his actions were lawful

under the facts as he reasonably, albeit mistakenly, perceived them to be." *Robinson v. State*, 377 S.W.3d 712, 720–21 (Tex. Crim. App. 2012).

Although neither Officer Castillo nor the State expressly identified the statute White allegedly violated, White assumed during the suppression hearing that the State was relying on Section 545.060(a) of the Texas Transportation Code and the State did not dispute White's assumption.[9] Section 545.060(a) states:

> (a)   An operator on a roadway divided into two or more clearly marked lanes for traffic:
>
>> (1)   shall drive as nearly as practical entirely within a single lane; and
>>
>> (2)   may not move from the lane unless that movement can be made safely.

TEX. TRANSP. CODE § 545.060(a); *see also State v. Hardin*, 664 S.W.3d 867, 875 (Tex. Crim. App. 2022) (holding person violates Section 545.060(a) only if they fail to maintain single marked lane of traffic and such failure occurs in unsafe manner).

## 2.   Analysis

White argues that Officer Castillo did not have reasonable suspicion that he violated any statute because the dash camera video does not show that he committed

---

[9]   White's counsel stated, "I'm assuming, from what the officer stated, that he is referencing Transportation Code 545.062, that you can make a lane change as long as it's done safely, that's an assumption on my part." Although White's counsel mistakenly identified the statute as Transportation Code Section 545.062, counsel was clearly referring to Section 545.060. *Compare* TEX. TRANSP. CODE § 545.060(a) (addressing lane changes) *with* TEX. TRANSP. CODE § 545.062 (requiring operators to follow behind other vehicles at specific distances).

a traffic violation. According to White, the video shows that Officer Castillo stopped his car "based on a false belief that [White] was illegally weaving through traffic, when in fact he was merely braking to allow a vehicle on his left to pass him, so he could change lanes safely before making a left turn from a multiple lane highway." White argues that the "truck behind him had to brake because it was following too closely, not because [White] made an illegal move."

During the suppression hearing, the State argued that the dash camera video showed that White committed multiple traffic violations. According to the State, White violated the law when he "stop[ped] in the middle of the road" causing "the truck [to] move off," failed to drive as much as practicable in his lane and changed lanes in an unsafe manner by making "all the lane changes at once," and he crossed the solid white line separating the left lane from the left turn-only lane.[10]

Reviewing the evidence in the light most favorable to the trial court's ruling, we conclude the totality of circumstances supported the officer's reasonable suspicion of criminal activity. The opinion in *Aviles v. State*, 23 S.W.3d 74 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) is instructive. In *Aviles*, the defendant

---

[10]    Officer Castillo did not state that he saw White's car stop in the lane or cross a solid white line. *See State v. Duran*, 396 S.W.3d 563, 572 (Tex. Crim. App. 2013) ("The question of whether an officer has reasonable suspicion to detain an individual for further investigation is determined from the facts and circumstances actually *known* to the officer at the time of the detention—what he saw, heard, smelled, tasted, touched, or felt—not what that officer could have or should have known.").

moved to suppress cocaine seized during a search of his vehicle. Aviles argued that the stop was illegal because the officer did not have a reasonable basis for believing he had committed a traffic violation. The officer testified that he saw Aviles "signal and then move over two lanes just before passing a disabled automobile on the left shoulder" and he followed Aviles as he exited the highway and pulled Aviles over for "making multiple lane change[s]." *Id.* at 75. The officer testified that Aviles signaled before each lane change, Aviles did not "cut anybody off" in either lane and no vehicle had to "take evasive measures" because of Aviles' lane changes. *Id.* at 76.

On appeal, the court rejected the State's argument that Aviles "committed a traffic violation when he made a multiple lane change in a single maneuver" and held that although "[m]aking a multiple lane change in a single maneuver is not a *per se* violation of any law," Aviles would have violated section 545.060(a) of the Transportation Code if he had made the lane changes unsafely. *Id.* at 77 (citing 545.060(a)). According to the court, the question raised on appeal was "whether a person of reasonable caution would believe that the multiple lane change could not have been made safely given the facts and experiences related by the officer." *Id.* The court stated:

> The record shows that the appellant was driving down U.S. Highway 59 during daylight hours in the freeway's far left lane. As he approached a disabled vehicle on the left shoulder of the freeway, he signaled a lane change and then "shot across two lanes." The appellant

38

did not cut any other vehicles off in either the first lane or the second lane. No other driver had to take measures to avoid the appellant's vehicle as a result of the appellant's maneuver. Shortly after making the multiple lane change, the appellant took the exit for Interstate–45, which was on the right side of U.S. Highway 59.

Making a deliberate move across two lanes of freeway traffic is arguably a safer maneuver than weaving or drifting into adjacent lanes, which tends to show the driver is not in control of his vehicle. . . . While there are undoubtedly countless circumstances in which a multiple lane change could not be accomplished safely, there is nothing about this traffic maneuver that makes it *inherently* unsafe. Because a multiple lane change is not inherently unsafe, and there is no evidence in the record to demonstrate that the appellant's multiple lane change was accomplished in an unsafe manner, we find the police officer did not have a reasonable basis for believing the appellant had committed a ticketable traffic offense.

*Id.* at 78 (emphasis in original).  The court further stated:

We emphasize that the result in this case occurs only because of the particular facts in the record before us, a record that is devoid of any evidence to support a reasonable basis for believing the appellant's multiple lane change was not made safely. Had the police officer testified that he had observed a sign of erratic driving, that traffic was congested and there was no room to safely execute a multiple lane change, or that the lane change could not be made safely for some other reason, the result might be different. The state has the burden to show that the appellant[']s detention was based upon a reasonable suspicion. It failed to do so on the facts presented.

*Id.* at 79.

In this case, Officer Castillo told White that he stopped him because White "went right across from the right shoulder all the way across to the turning lane.  I mean you could have gotten into a crash right there" and Officer Castillo testified at

39

trial that he stopped White after he observed White's car "driving in and out of traffic," causing other vehicles to "brake suddenly."[11]

The only other evidence before the court regarding the legality of the stop is Officer Castillo's dash camera video. The dash camera video, which is one minute and five seconds long, shows an 18-wheeler truck and two cars traveling on a four-lane road approaching a highway intersection late at night with their brake lights activated. The 18-wheeler was traveling in the far-right lane behind White's car, as a third car traveling in the far-left turn lane approached them from behind. White, who had activated his left turn signal, moved into the left lane as the truck behind him veered to the right and briefly onto the shoulder presumably to avoid hitting White's car. Still using his turn signal, White crossed into the far-left turn lane after the car in the turn lane passed in front of him. It took approximately five seconds from the time the video began for White to move from the far-right lane to the far-left turn lane.

---

[11] Although Officer Castillo did not testify during the suppression hearing, we may nevertheless consider his trial testimony for purposes of resolving White's challenge to the denial of his motion to suppress because White and the State consensually relitigated the legality of the traffic stop during trial. *See Enns v. State*, 612 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (stating that appellate courts reviewing ruling on motion to suppress generally limit review to evidence introduced at suppression hearing, but other relevant testimony may be considered when parties consensually relitigate issue at trial).

While the dash camera video reflects that White used his turn signal before making every lane change and he waited for the car on the left to pass him before he crossed into the left-hand turn lane, the video also shows that the truck following behind White's car activated its brakes after White's car braked and the truck veered onto the shoulder. The video does not depict how closely the truck was following behind White's car nor does it reflect another reason why the truck braked and veered out of its lane after White activated his brakes.

The trial court reasonably could have found based on Officer Castillo's statements and the dash camera video that the truck had to take evasive maneuvers to avoid hitting White's car from behind as White slowed down his car to change lanes multiple lanes of traffic late at night, and thus that White's lane change was made in an unsafe manner. *See Terry*, 392 U.S. at 21 (stating reasonable suspicion exists when officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion"); TEX. TRANSP. CODE § 545.060(a) (requiring operator "drive as nearly as practical entirely within a single lane" and "not move from the lane unless that movement can be made safely"). The trial court's implicit finding is not inconsistent with the video which does not show another reason for the truck's sudden departure from its lane after White braked. *See Houghton*, 384 S.W.3d at 446 (stating reviewing court should

give almost total deference to trial court's factual determinations unless video recording indisputably contradicts those findings).

We hold the trial court did not err in denying White's motion to suppress the methamphetamine and cocaine because Officer Castillo provided objective, articulable facts supporting a reasonable suspicion to believe that White had committed a traffic violation by changing multiple lanes unsafely, causing the truck behind him to swerve out of its lane to avoid striking White's car from behind. *See* TEX. TRANSP. CODE § 545.060(a) (requiring operator "drive as nearly as practical entirely within a single lane" and "not move from the lane unless that movement can be made safely"); *Munoz v. State*, 649 S.W.3d 813, 819–20 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (holding officer's observation of moving from lane unsafely provided reasonable suspicion of traffic violation to justify stop).

We overrule the portion of White's first issue challenging the existence of reasonable suspicion.

## C.    Illegally Prolonged Detention

White argues the trial court abused its discretion by denying his motion to suppress the methamphetamine and cocaine found in the car because the search was the result of an illegally prolonged detention. According to White, once Officer Castillo told White that he was not issuing him a citation, "Officer Castillo had no

42

articulable facts from which he could discern that any illegal activity was afoot aside from the alleged traffic violation."

During the suppression hearing, the State argued there were suspicious circumstances from the beginning of the stop, including that White was driving someone else's car, White could not produce proof of insurance, and White only had a picture of his driver's license on his phone, as opposed to the actual license, and that license was invalid. The State argued that as Officer Castillo was investigating these possible violations, White kept "giving him more and more evidence that something fishy [was] going on here." According to the State, White struggled to answer questions, he acknowledged to Officer Castillo that he was nervous, and White's claim that he had just met Love was inconsistent with the message from Love to White that White showed to Officer Castillo. White also "talk[ed] about using drugs" and the possibility of drugs being in the vehicle, and these things all occurred prior to the search. According to the State,

> And when we get to the point where we've got all these facts, facts that [White's counsel] acknowledged, going to a—coming from a strange place; meeting someone you just met that day, according to you, and even there it's not clear; driving around with no insurance; car you don't own; no valid driver's license. The more we find out, the more the officer is justified in suspecting there's something else going on here. Once the drug conversation starts going and defendant starts admitting, maybe there's something in there, I don't know, the officer is definitely justified in the search . . . .

43

In rebuttal, White argued that some of the facts the State was relying on had occurred after Officer Castillo told White that he was not issuing him a citation.

### 1. Applicable Law

"[T]he general rule is that an investigative stop can last no longer than necessary to effect the purpose of the stop." *Kothe v. State*, 152 S.W.3d 54, 63 (Tex. Crim. App. 2004). "During a traffic stop, an officer may demand identification, a valid driver's license, and proof of insurance from the driver, and may also check for outstanding warrants." *Simpson v. State*, 29 S.W.3d 324, 327 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). Further, "an officer is entitled to request information concerning the driver's license, ownership of the vehicle, the driver's insurance information, the driver's destination, and the purpose of the trip." *McQuarters v. State*, 58 S.W.3d 250, 255–56 (Tex. App.—Fort Worth 2001, pet. ref'd).

A traffic stop is generally resolved after the officer learns that the driver has a valid license, no outstanding warrants, and the car is not stolen. *Kothe*, 152 S.W.3d at 63–64. Once the traffic stop investigation is concluded, the officer must no longer detain the driver, who must be permitted to leave. *Id.*; *see Davis v. State*, 947 S.W.2d 240, 243 (Tex. Crim. App. 1997) (stating once reason for initial stop satisfied, stop may not be used as "fishing expedition for unrelated criminal activity"). If, during the traffic stop, however, "the officer develops reasonable suspicion that the detainee

is engaged in criminal activity, prolonged or continued detention is justified." *Haas v. State*, 172 S.W.3d 42, 52 (Tex. App.—Waco 2005, pet. ref'd); *see also Powell v. State*, 5 S.W.3d 369, 377 (Tex. App.—Texarkana 1999, pet. ref'd) ("After the initial traffic-violation stop, the officer is entitled to rely on all of the information obtained during the course of his contact with the citizen in developing the articulable facts that would justify a continued investigatory detention.").

We look to the totality of the circumstances to determine whether a detaining officer had a particularized and objective basis for suspecting legal wrongdoing. *Ramirez-Tamayo v. State*, 537 S.W.3d 29, 36 (Tex. Crim. App. 2017); *Furr*, 499 S.W.3d at 878 (courts consider cumulative force of all circumstances).

### 2. Analysis

White argues that the facts the State relied on during the suppression hearing all occurred after Officer Castillo announced that he was not going to issue White a citation. Contrary to White's argument, the evidence reflects that before Office Castillo informed White that he was not going issue him a citation, Officer Castillo had sufficient evidence to raise a reasonable suspicion that White was engaged in criminal conduct.

Officer Castillo testified that when he initially approached White's car, he noticed "an excess of air fresheners and energy drinks" in the car. According to Officer Castillo, the presence of excessive energy drinks indicates a person is trying

45

to stay awake and air fresheners indicate someone is trying to hide an odor, including the odor of illegal drugs such as marijuana. Although these factors standing alone are not meaningful, when "paired with something else there would be the indication that something may be transported for a very long distance that somebody is trying to mask an odor of."

White, who did not have a valid driver's license and could not produce proof of insurance, was nervous and gave Officer Castillo an implausible explanation for his trip. White claimed that he borrowed his girlfriend's car at 10:00 p.m.[12] for the sole purpose of driving over 200 miles to pick up Love, a woman he barely knew, to drive Love from Fredericksburg to Elgin for $60 in gas money.[13] White told Officer Castillo that he met Love that day when she accidently texted him and asked him for a ride to Elgin and he agreed to drive her for $60 in gas money. When Officer Castillo expressed skepticism, White told him that a stranger had recently helped him and his girlfriend when their car battery died, and White wanted to help Love because, in Officer Castillo's words, he wanted to "pay it forward."

---

[12] Officer Castillo testified that he stopped White's vehicle at approximately 10:30 p.m. and White told Officer Castillo that he took possession of the car thirty minutes before the stop.

[13] We take judicial notice of the facts that it is approximately: (1) 94 miles from Round Rock to Fredericksburg, (2) 107 miles from Fredericksburg to Elgin, and (3) 30 miles from Elgin to Round Rock.

Officer Castillo also testified that although White was consistent about some things, such as that he was driving to Fredericksburg to pick up Love and give her a ride to Elgin, White made inconsistent statements about his relationship with Love. According to Officer Castillo, White told him that he had just met Love that day, but the text message Love sent to White disputed White's claim because, in her message to White, Love stated that she could not wait to see him again. White's implausible explanation for his trip, the inconsistent evidence of White's relationship with Love, and his nervousness are all factors that can raise a reasonable suspicion of criminality. *See Haas*, 172 S.W.3d at 54 ("Increasing or extreme nervousness and conflicting or implausible information can, along with other factors, raise a reasonable suspicion.").

After Officer Castillo informed White that he was not going to issue him a citation and he asked to search White's car to make sure there was nothing illegal inside, White told Officer Castillo that his girlfriend Angelina, who had driven the car right before him, owned the car and she used drugs including ice. White repeatedly told Officer Castillo he did not want him to search the car because White did not know what was in the car and he did not want to "take the rap" for anything that might be inside. White, who was visibly nervous, even offered to check the car himself and discard anything he found. *See Hammontree v. State*, No. 12-21-00139-CR, 2022 WL 3012438, at *6 (Tex. App.—Tyler July 29, 2022, pet. ref'd) (mem.

47

op., not designated for publication) (identifying "Appellant's appearing to prepare excuses for anything that might be found in the vehicle, and Appellant's attempt to obtain permission to re-enter the vehicle before the dog arrived to perform an open-air search" as evidence supporting officer's reasonable suspicion of criminal conduct).

After Officer Castillo told White that he was going to call for additional resources to search the car, White admitted to Officer Castillo that he was "extremely nervous." White told Officer Castillo that he was on probation for assault with a deadly weapon and that "back in the day [he] used to use." *See generally Powell v. State*, 5 S.W.3d 369, 378 (Tex. App.—Texarkana 1999, pet. ref'd) (considering prior drug offenses and nervousness in continued detention). White repeatedly sought reassurance that he would not get in trouble for anything in the car that was not his, and he asked to retrieve his belongings from the car before it was searched. *See Hammontree*, 2022 WL 3012438, at \*6 (identifying "Appellant's attempt to obtain permission to re-enter the vehicle before the dog arrived to perform an open-air search" as evidence supporting officer's reasonable suspicion of criminal conduct). Officer Castillo continued to request permission to search the car, and after White consented to a search, he told Officer Castillo, "I know her bag is in there. That is hers. I have nothing to do with that." *See id.* (identifying giving excuses for anything

48

that might be found in vehicle as evidence supporting officer's reasonable suspicion of criminal conduct).

The record thus reflects that prior to informing White that he would not issue a citation, Officer Castillo was aware that White did not have a valid license or proof of insurance, White gave an implausible explanation for his trip to Fredericksburg, there was conflicting evidence regarding White's relationship to Love, there was an excess of air fresheners and energy drinks inside the car, and White was nervous during his encounter with Officer Castillo. This information, when considered as a whole, was sufficient information supporting Officer Castillo's reasonable suspicion that he would find illegal drugs in the car. *See Ramirez-Tamayo*, 537 S.W.3d at 36 (stating courts look to totality of circumstances to determine whether officer had particularized and objective basis for suspecting legal wrongdoing); *see also Furr*, 499 S.W.3d at 878 (courts consider cumulative force of all circumstances); *Haas*, 172 S.W.3d at 52 (stating if "officer develops reasonable suspicion that the detainee is engaged in criminal activity, prolonged or continued detention is justified").

After Officer Castillo told White that he would not issue him a citation, White told him that Angelina had driven the car immediately before him, and Angelina, who owned the car, used drugs including ice. White denied knowing if there was anything illegal in the car, but he repeatedly sought assurances from Officer Castillo that he would not be held responsible for any contraband that might be inside. He

also offered to search the car himself and asked to remove his belongings before any search. He also admitted that he was on probation, and he used to use illegal drugs. Once he consented to the search, he told White that Angelina's bag was in the car, and he had "nothing to do with that." This information, when considered as a whole, was sufficient information supporting Officer Castillo's ongoing reasonable suspicion that he would find illegal drugs in the car and justified his continued detention of While until the car could be searched. *See Ramirez-Tamayo*, 537 S.W.3d at 36 (stating courts look to totality of circumstances to determine whether officer had particularized and objective basis for suspecting legal wrongdoing); *see also Haas*, 172 S.W.3d at 52 (stating prolonged or continued detention justified if officer develops reasonable suspicion defendant engaged in criminal activity).

Based on the evidence before us, we conclude the trial court's implied finding that the stop was not excessive in duration or scope was proper. *See Garcia-Cantu*, 253 S.W.3d at 241 (stating when trial court does not make explicit findings of fact, appellate courts imply necessary fact findings that would support ruling if evidence, viewed in light most favorable to trial court's ruling, supports those implied findings).

We overrule that portion of White's first issue related to the length of his detention.

**D.     Consent**

White further argues the trial court abused its discretion by denying his motion to suppress the methamphetamine and cocaine because he did not voluntarily consent to the search of the car.  During the suppression hearing, the State argued that the search satisfied the Fourth Amendment under both the consent and automobile exception to the Fourth Amendment's warrant requirement.[14]  White did not dispute the automobile exception applied.

**1.     Applicable Law**

Under the Fourth and Fourteenth Amendments, a search conducted without a warrant based on probable cause is "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions."  *Meekins v. State*, 340 S.W.3d 454, 458 (Tex. Crim. App. 2011).  The defendant's voluntary consent to the search and the automobile exception are two recognized exceptions to the warrant requirement.  *See State v. Villarreal*, 475 S.W.3d 784, 796 (Tex. Crim. App. 2014).  A warrantless search is thus valid "even if consent was involuntarily given, if the

---

[14]     The State argued:

> But even if the search is not voluntary, I would suggest to the Court the search and the evidence is not suppressible because it's also a probable cause search. At that point, we have all the facts we've talked about, I won't belabor the Court by going over again. The officer knows about the criminal record at that point, knows about the possible presence of drugs at that point from the defendant's own mouth . . . We've got a good stop, a good length of detention, a good search under both doctrines consent or probable cause backed up by the evidence.

51

State proves that the officer had probable cause at the time the search was conducted and . . . the automobile exception appl[ies]." *Dickey v. State*, 96 S.W.3d 610, 612 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (citing *Carroll v. United States*, 267 U.S. 132, 156 (1925) and *Scott v. State*, 531 S.W.2d 825, 827 (Tex. Crim. App. 1976)). "Under the automobile exception, law enforcement officials may conduct a warrantless search of a vehicle if it is readily mobile and there is probable cause to believe that it contains contraband." *Keehn v. State*, 279 S.W.3d 330, 335 (Tex. Crim. App. 2009).[15] "Probable cause to search exists when there is a 'fair probability' of finding inculpatory evidence at the location being searched." *Neal v. State*, 256 S.W.3d 264, 282 (Tex. Crim. App. 2008).

## 2. Analysis

The record reflects that prior to the search, White told Officer Castillo that the car belonged to his girlfriend Angelina, Angelina used methamphetamine and other drugs, and Angelina had been driving the car immediately before White took possession of the car. White, who denied knowing whether there were illegal drugs in the car, nonetheless repeatedly told Officer Castillo that he did not want to get in trouble for anything illegal in the car or otherwise "take the rap" for it. He admitted to Officer Castillo that he used illegal drugs in the past, but he had stopped using

---

[15]    There is no dispute that the car was mobile. *See Keehn v. State*, 279 S.W.3d 330, 335 (Tex. Crim. App. 2009) (stating automobile exception applies when there is probable cause to believe that readily mobile vehicle contains contraband).

and had turned his life around. White also repeatedly sought assurances from Officer Castillo that he would not be held responsible for anything in the car that did not belong to him. Officer Castillo testified that White exhibited nervous behavior during their interaction, such as speaking quickly, and the record reflects that White fidgeted with a bandana while he spoke to Officer Castillo, showed Officer Castillo his shaking hands, and admitted to being extremely nervous prior to the search. Officer Castillo had also noticed "an excess of air fresheners and energy drinks" in the car, which can indicate that someone may be transporting something for a long distance that they are "trying to mask an odor of," such as marijuana. This evidence, taken as a whole, establishes there was a fair probability that Officer Castillo would find illegal drugs in the car, and we thus conclude that Officer Castillo had probable cause to search the car for illegal drugs. *See Neal*, 256 S.W.3d at 282 (stating probable cause to search exists if fair probability of finding inculpatory evidence at location being searched).

Regardless of whether White voluntarily consented to the search, the record reflects that Officer Castillo had probable cause to search the car for illegal drugs, and the search thus satisfied the automobile exception to the warrant requirement. *See Keehn*, 279 S.W.3d at 335 ("Under the automobile exception, law enforcement officials may conduct a warrantless search of a vehicle if it is readily mobile and there is probable cause to believe that it contains contraband."). The trial court thus

did not abuse its discretion by implicitly finding that the search was lawful because the automobile exception satisfied the warrant requirement. *See Garcia-Cantu*, 253 S.W.3d at 241 (stating when trial court does not make explicit findings of fact, appellate courts imply necessary fact findings that would support ruling if evidence, viewed in light most favorable to trial court's ruling, supports those implied findings).

We overrule the portion of White's first issue challenging the voluntariness of his consent to search the car.

## Article 38.23 Instruction

In his third issue, White argues the trial court abused its discretion by not including an Article 38.23 instruction in the jury charge because Officer Castillo's description of White's driving, which is the basis for the traffic stop, conflicted with the dash camera video's depiction of White's driving prior to the stop. Specifically, White argued that the video showed that he did not weave in and out of traffic as Officer Castillo testified. During the charge conference, the State argued that even if there was "affirmative evidence that [White] didn't quite drive the way [Officer Castillo] described," White was not entitled to an Article 38.23 instruction because there were other facts supporting Officer Castillo's reasonable suspicion that a traffic violation had occurred.

## A. Standard of Review

We review potential jury charge error using a two-step review to determine whether reversal is required. *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005); *Vernon v. State*, 571 S.W.3d 814, 826 (Tex. App.—Houston [1st Dist.] 2018, pet ref'd). We first decide whether error exists in the charge. *Ngo*, 175 S.W.3d at 744. If we determine an error exists, we next determine whether sufficient harm resulted from the error requiring reversal. *Id.* The level of harm necessary for reversal depends on whether the appellant properly objected to the error. *Abdnor v. State*, 871 S.W.2d 726, 732 (Tex. Crim. App. 1994). When as here, an appellant has preserved error, we review the charge error for "some harm." *See Jordan v. State*, 593 S.W.3d 340, 346 (Tex. Crim. App. 2020) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)). "Some harm" means actual harm and not merely a theoretical complaint. *Cornet v. State*, 417 S.W.3d 446, 449 (Tex. Crim. App. 2013). To determine if there has been "some harm," we must look at: (1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record. *Elizondo v. State*, 487 S.W.3d 185, 205 (Tex. Crim. App. 2016) (citing *Almanza*, 686 S.W.2d at 171). Reversal is required if the error was calculated to injure the rights of the defendant. *Cornet*, 417 S.W.3d at 449 (quoting *Almanza*, 686 S.W.2d at 171).

**B.    Code of Criminal Procedure Article 38.23(a)**

Article 38.23(a) of the Code of Criminal Procedure provides as follows:

No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

TEX. CODE CRIM. PROC. art. 38.23(a).

The purpose of the jury charge is to instruct the jurors on "all of the law that is applicable to the case." *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012). When there is a disputed fact issue that is material to the defendant's claim of a constitutional or statutory violation that would render evidence inadmissible, an exclusionary-rule instruction is required by Article 38.23(a). *Madden v. State*, 242 S.W.3d 504, 509–10 (Tex. Crim. App. 2007).

A defendant must thus satisfy three requirements before being entitled to the submission of a jury instruction under Article 38.23(a): (1) the evidence heard by the jury must raise an issue of fact; (2) the evidence on that fact must be affirmatively contested; and (3) the contested factual issue must be material to the lawfulness of the challenged conduct in obtaining the evidence. *Id.* at 510; *Hamal v. State*, 390 S.W.3d 302, 306 (Tex. Crim. App. 2012); *see also Robinson v. State*, 377 S.W.3d

56

712, 719 (Tex. Crim. App. 2012) ("Where the issue raised by the evidence at trial does not involve controverted facts, but only the proper application of the law to undisputed facts, that issue is properly left to the determination of the trial court.").

Evidence to justify an Article 38.23(a) instruction can derive "from any source," no matter whether "strong, weak, contradicted, unimpeached, or unbelievable." *Robinson*, 377 S.W.3d at 719; *Chambers v. State*, 663 S.W.3d 1, 5 (Tex. Crim. App. 2022) (holding material fact affirmatively contested by dashcam video and still photographs; "a conflict exists between the officer's testimony claiming that there was no license plate and the dashcam video and photos depicting a license plate"); *Mills v. State*, 296 S.W.3d 843, 848 (Tex. App.—Austin 2009, pet. ref'd) ("[V]ideo [is] affirmative evidence capable of supporting the inference that Sherwood could not have seen—and did not see—whether or not Mills had activated his turn signal within one-hundred feet of the intersection."). But it must, in any event, raise a "factual dispute about how the evidence was obtained." *Robinson*, 377 S.W.3d at 719.

## C. Analysis

On appeal, White argues that Officer Castillo's testimony concerning White's driving was inconsistent with the driving shown on the dash camera. According to White,

> Officer Castillo's testimony concerning Appellant's driving was in contrast with the driving shown on the dash cam. While Appellant did

not testify about his driving behavior, the video itself affirmatively challenged Officer Castillo's testimony that Appellant drove in a reckless manner. The conflicting evidence was material to a determination regarding whether Officer Castillo was justified in making an initial stop, since dangerously weaving through traffic can support a stop for reckless driving, while a braking to allow a vehicle to pass on the left before moving into the left lane in preparation for a left turn does not.

During the charge conference, the State argued even if there was "affirmative evidence that [White] didn't quite drive the way [Officer Castillo] described, [Officer Castillo] still had ample basis for his reasonable suspicion that a traffic violation had occurred." *See Madden*, 242 S.W.3d at 510 (stating "if other facts, not in dispute, are sufficient to support the lawfulness of the challenged conduct, then the disputed fact issue is not submitted to the jury because it is not material to the ultimate admissibility of the evidence").

According to White, the dash camera video affirmatively challenged Officer Castillo's testimony that White drove "in and out of traffic" and in a reckless manner and the conflicting evidence was "material to a determination regarding whether Officer Castillo was justified in making an initial stop, since dangerously weaving through traffic can support a stop for reckless driving, while a braking to allow a vehicle to pass on the left before moving into the left lane in preparation for a left turn does not."

The video captured by Officer Castillo's body camera reflects that Officer Castillo told White that he stopped him because White "went right across from the

58

right shoulder all the way across to the turning lane. I mean you could have gotten into a crash right there." When asked during trial what prompted him to stop White's car, Officer Castillo testified:

> I saw a vehicle that was driving in and out of traffic. Some vehicles had to brake. They'd brake suddenly, so then it caught my attention to the specific vehicle and so I caught up to it, read the license plate, and made the stop.

Even if the video affirmatively contradicts Officer Castillo's testimony that White drove in and out of traffic, it is undisputed that, as depicted on the video, White crossed multiple lanes of traffic in quick succession. It is also undisputed that, after White braked to make the lane changes, the truck following behind White braked and swerved onto the shoulder to avoid striking White's car. Evidence the truck had to take evasive maneuvers to avoid hitting White's car from behind because White slowed down his car to change lanes multiple lanes of traffic late at night provides a basis for the stop, for which no Article 38.23 instruction is necessary. *See Madden*, 242 S.W.3d at 510 (stating "if other facts, not in dispute, are sufficient to support the lawfulness of the challenged conduct, then the disputed fact issue is not submitted to the jury because it is not material to the ultimate admissibility of the evidence"); TEX. TRANSP. CODE § 545.060(a) (requiring operator "drive as nearly as practical entirely within a single lane" and "not move from the lane unless that movement can be made safely"). We thus conclude the trial court did not abuse its discretion by refusing to include an Article 38.23 instruction in the charge. *See Robinson*, 377

59

S.W.3d at 719 ("Where the issue raised by the evidence at trial does not involve controverted facts, but only the proper application of the law to undisputed facts, that issue is properly left to the determination of the trial court.").

We overrule White's second issue.

## Conclusion

We affirm the trial court's judgment.


Veronica Rivas-Molloy
Justice


Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.

Do Not Publish.   TEX. R. APP. P. 47.2(b).